Colin P. King (1815)
cking@dkowlaw.com
Peter W. Summerill (8282)
psummerill@dkowlaw.com
DEWSNUP KING OLSEN
HAVAS MORTENSEN
36 S. State Street, Suite 2400
Salt Lake City, UT 84111
Telephone: (801) 533-0400
Facsimile: (801) 363-4218

Robert J. Francavilla, *pro hac vice pending*
rjf@cglaw.com
Meagan L. Verschueren, *pro hac vice pending*
meagan@cglaw.com
CASEY GERRY SCHENK
FRANCAVILLA BLATT & PENFIELD, LLP
110 Laurel Street
San Diego, CA  92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| MINDY CASTLEMAN,<br><br>        Plaintiff,<br><br>vs.<br><br>FCA US LLC f/k/a CHRYSLER GROUP, LLC,<br><br>        Defendant. | **COMPLAINT AND JURY DEMAND**<br><br>Case No.:<br><br>Judge: |

Plaintiff Mindy Castleman, by and through her counsel of record, Colin P. King and Peter W. Summerill of Dewsnup/King/Olsen/Worel/Havas/Mortenson, allege against the Defendant as follows:

## PARTIES & JURSIDICTION

1. Plaintiff Mindy Castleman is a resident of the state of California.

2. Defendant FCA US LLC (Fiat Chrysler Automobiles U.S., LLC), (hereinafter "FCA") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Auburn Hills, Michigan. Upon information and belief, FCA U.S., LLC was formally known as Chrysler Group, LLC. FCA is engaged in the business of designing, manufacturing, marketing, promoting, advertising and selling automobiles and component parts of automobiles in the State of Utah and throughout the world.  FCA transacts business in the State of Utah and maintains a registered agent in the State of Utah.  FCA is a resident of the State of Utah for purposes of personal jurisdiction and is subject to the jurisdiction and venue of this Court.  FCA may be served with process through its registered agent, 1108 East South Union Avenue, Midvale, Utah 84047.  The injury-producing event occurred in Utah, so this Court has specific personal jurisdiction over FCA.

3. This Court has Subject Matter Jurisdiction because the amount in controversy exceeds $75,000 and the parties are citizens of different states.

## GENERAL ALLEGATIONS

4. Plaintiff realleges and incorporates the above allegations as though fully set forth herein.

5. As used throughout, "SUBJECT VEHICLE," "PRODUCT," or "PRODUCTS" shall refer to the FCA US LLC, formerly known as Chrysler Group, LLC 2004 Jeep Grand

Cherokee Loredo Vehicle Identification Number 1J8GX48SX4C430039 designed, manufactured, sold, and delivered by Defendant, and any and all component parts, which was driven by Plaintiff Mindy Castleman on May 1, 2016.

6.   Defendant, at the time the SUBJECT VEHICLE was manufactured and sold, engaged in the business of manufacturing, fabricating, designing, assembling, building, packaging, testing, importing, distributing, selling, inspecting, servicing, repairing, marketing, labeling, warranting,  retailing, wholesaling, advertising, and otherwise introducing into the stream of commerce, a certain subject 2004 Jeep Grand Cherokee Laredo, Vehicle Identification Number 1J8GX48SX4C430039, California License Plate No. 6VYB502, and each and every component part and system thereof (hereinafter, the "SUBJECT VEHICLE" and/or "PRODUCT").

7.   The SUBJECT VEHICLE was defective in its design, manufacture, testing, maintenance, delivery, advertising, selling, distribution, and introduction into the stream of commerce, as well as in being supplied without important crashworthiness and protection systems and with inadequate crashworthiness and protection systems, including but not limited to inadequate roof structures, inadequate roof materials, inadequate roof-crush resistance, lack of electronic stability control, and inadequate protection systems. It was reasonably foreseeable to FCA that the SUBJECT VEHICLE would foreseeably experience a rollover event and sustain roof-crush damage when a non-professional ordinary driver was faced with a sudden and emergency situation in which she would be required to make protective turning maneuvers.

8.   Defendant knew and intended that the SUBJECT VEHICLE would be purchased, rented, leased, owned, operated, and used by members of the general public without inspection for defects in its parts, mechanisms, systems, manufacture or design, including but not limited to

3

its roof structure and component parts, the presence or lack of a side curtain airbag system, restraint and protection systems, and presence or lack of any electronic stability control and related components that were designed, tested, manufactured, assembled, sold and/or distributed by Defendant for use in the United States, inclusive of Utah, and elsewhere.  Furthermore, Defendant knew members of the general public would rely on Defendant to safely design, manufacture, market, and distribute the SUBJECT VEHICLE in a safe manner and to transmit any relevant warnings about it.

9.   Despite its actual knowledge of the risks of rollover, roof crush, and other consequences of events begun when a driver is making required, foreseeable, and necessary protective turning maneuvers, Defendant continued to produce vehicles and component parts and systems with defective, inadequate, insufficient, non-functioning, and/or absent roof-crush resistance, rollover/stability protection, occupant protection, roof structure and component parts thereof, crashworthiness, side curtain airbag systems, restraint and protection systems rendering the restraint system completely ineffective and otherwise useless to protect occupants in rollover/roof crush incidents, and electronic stability control, which, upon foreseeable impact, could cause and has caused catastrophic injuries to drivers and passengers including but not limited to Plaintiff Mindy Castleman.

10. Defendant's corporate culture of indifference to known rollover and roof-crush risks continued through the manufacturing, fabricating, designing, building, testing, assembling, packaging, importing, distributing, selling, inspecting, servicing, repairing, marketing, labeling, warranting, retailing, wholesaling, advertising, and otherwise introducing into the stream of commerce of the SUBJECT VEHICLE and its component parts and systems.

11. On or about May 1, 2016, at approximately 9:10 p.m., Plaintiff Mindy Castleman ("Ms. Castleman"), was the driver of the SUBJECT VEHICLE, traveling eastbound on Interstate 70 near mile post 183 close to the City of Moab, State of Utah. While Ms. Castleman was driving, the SUBJECT VEHICLE was caused to overturn/rollover.

12. Because of the SUBJECT VEHICLE's defective, insufficient, non-functioning, and/or absent roof-crush resistance, lack of crashworthiness, lack of electronic stability control, lack of a side curtain airbag system, and defective restraint and protections systems including poor seat belt geometry rendering the restraint system completely ineffective and otherwise useless to protect occupants during rollover and roof crush incidents, the SUBJECT VEHICLE rolled over, and the roof structure severely crushed due to its lack of crashworthiness, as a result of the foregoing. Ms. Castleman was severely and critically injured. The above set of facts is hereafter referred to as the "SUBJECT INCIDENT."

13. As result of the SUBJECT INCIDENT, Ms. Castleman was taken by Life Flight to St. Mary's Medical Center in Grand Junction, Colorado. At St. Mary's Medical Center, Ms. Castleman was diagnosed critically with (1) paralysis; (2) cervical spine instability; (3) multiple rib fractures; (4) left scapular fracture; (5) an orbital floor fracture; (6) lacerations on her left kidney, scalp and elbow; and (7) multiple abrasions.

14. In the weeks following the SUBJECT INCIDENT, Ms. Castleman required multiple surgeries and medical procedures performed as a result of her injuries directly caused by the SUBJECT INCIDENT. The surgeries and procedures, include but are not limited to, an arterial line placement, a flexible fiberoptic bronchoscopy, anterior and posterior cervical spine fusion surgery, left orbital floor fracture repair, and an external table craniectomy with adjacent tissue transfer.

## FIRST CAUSE OF ACTION
### (Strict Product Liability)

15. Plaintiff realleges and incorporates the above allegations as though fully set forth herein.

16. Defendant knew that the SUBJECT VEHICLE containing its component parts and systems was to be purchased and used without inspection for defects by its users, including but not limited to the owner and driver of the SUBJECT VEHICLE, on the date of the SUBJECT INCIDENT.

17. The SUBJECT VEHICLE and each of its component parts were designed, manufactured, assembled, imported, packaged, tested, fabricated, analyzed, inspected, merchandised, marketed, distributed, labeled, advertised, promoted, sold, supplied, leased, tested, delivered, rented, repaired, serviced, adjusted, selected, and used with inherent defects both in design and manufacture and was in the condition at the time it left the control of the Defendant and by Defendant's misrepresentation and failure to warn (hereinafter the "SUBJECT DEFECTS"). The SUBJECT DEFECTS made the SUBJECT VEHICLE dangerous, hazardous, and unsafe both for its intended use and for reasonably foreseeable misuses.

18. It was foreseeable to Defendant that the SUBJECT VEHICLE and its component parts would and could be involved in a motor-vehicle accident.

19. Defendant knowingly designed, tested, assembled, manufactured, supplied, imported, marketed, promoted, sold, distributed, and put into the stream of commerce the SUBJECT VEHICLE in a defective and unreasonably dangerous condition in that the SUBJECT VEHICLE failed to perform as safely as an ordinary user would expect when the SUBJECT VEHICLE was used in a manner reasonably foreseeable to Defendant and a safer alternative design was available to Defendant that was technically and economically feasible under the

circumstances. Defendant is strictly liable for the SUBJECT DEFECTS that, on May 1, 2016, caused severe and permanent injuries and damages to Ms. Castleman.  The SUBJECT DEFECTS for which Defendant FCA is liable more specifically include but are not limited to the following:

a.      HANDLING AND STABILITY, AND LACK OF ESC: Insufficient directional and lateral stability to keep the vehicle in control and upright during cornering and handling by an ordinary driver during reasonably foreseeable roadway and traffic conditions. This lack of handling and stability included unreasonable narrow track width and a high center of gravity, as well as the absence of Electronic Stability Control ("ESC"), which was technologically feasible and readily available to Defendant at the time of the design and manufacture of the SUBJECT VEHICLE. An ESC system should have been installed in the SUBJECT VEHICLE as standard equipment given (1) the inherent lack of directional and lateral instability, (2) rollover propensities of the SUBJECT VEHICLE known to Defendant, and (3) the likelihood that a rollover threatened severe injuries or fatalities to vehicle occupants because of the defective roof and component parts.

b.      ROOF CRUSH: "A", "B", "C", and "D" pillars/windshield headers and roof rails fabricated without sufficient strength and structural integrity to withstand roof crushing forces without compromising the survival space and imparting injury-producing forces upon vehicle occupants during foreseeable  rollover incidents, which rollover propensities were significantly heightened, as the Defendant knew before, during, and after manufacture, by the SUBJECT VEHICLE's relatively low Static Stability Factor ("SSF") as well as lack of ESC. The roof crush in the SUBJECT INCIDENT was severe on the driver side where Ms. Castleman was sitting.

c.      NO SIDE-CURTAIN ROLLOVER AIRBAGS: Lack of side-impact and rollover-protection airbags that, had they been installed, would have deployed under the circumstances of this reasonably foreseeable SUBJECT INCIDENT. The absence of these airbags allowed Ms. Castleman to receive severe injuries to her head, neck, and upper body. A side-curtain rollover airbag system should have been standard equipment on the SUBJECT VEHICLE given (1) the inherent lack of directional and lateral instability, lack of ESC, and, rollover propensities of the SUBJECT VEHICLE known to Defendant before and at the time of design and manufacture; and (2) the likelihood that a rollover threatened severe injuries or fatalities to vehicle occupants.

d.      MISREPRESENTATION AND FAILURE TO WARN: Defendant despite its actual knowledge of the above dangers and defects in the SUBJECT VEHICLE, misrepresented the purported safety of the SUBJECT VEHICLE and gave no advance warnings of the SUBJECT DEFECTS to Ms. Castleman and/or other purchasers and users of the SUBJECT VEHICLE.  As a result of the foregoing, the SUBJECT VEHICLE was defective and unreasonable because it lacked any or adequate warning.  Defendant knew or in the exercise of reasonable care should have known that the potential and inherent risks presented a substantial danger to users of the PRODUCT because Defendant possessed special knowledge of the materials, designs, characteristics, and manufacture of the PRODUCT.  Ms. Castleman and ordinary consumers would not know, detect, or suspect, nor have knowledge that the SUBJECT VEHICLE was dangerous and defective.  Although Defendant possessed special knowledge of the probable risks and substantial danger to users of the product, Defendant failed to warn or adequately warn of the probable risks and dangerous and defective conditions of the PRODUCT.

20. The defective and unreasonably dangerous conditions of the SUBJECT VEHICLE, including but not limited to the SUBJECT DEFECTS, rendered it non-crashworthy and the legal cause of Ms. Castleman's injuries and damages.

21. Ms. Castleman was harmed and suffered injuries and damages as alleged as a result of Defendant's failure to warn or adequately warn and the lack of warnings was a substantial factor in causing Ms. Castleman's harms and losses.

22. The SUBJECT VEHICLE and each of its component parts, aftermarket parts, and installation guides were unsafe for their intended use and reasonably foreseeable misuses by reason of defects in their design, manufacture, failure to warn, and misrepresentation by Defendant in that when the SUBJECT VEHICLE and each of its component parts, aftermarket parts, and installation guides were used on or about May 1, 2016, as intended or in a reasonably foreseeable manner, the SUBJECT VEHICLE, during reasonably foreseeable driving maneuvers, was dangerous and suffered a loss of or insufficient directional and lateral stability so as to keep the vehicle under control and upright during cornering and handling by an ordinary driver during reasonably foreseeable roadway and traffic conditions, including but not limited to driving maneuvers at highway speeds. As a result, the SUBJECT VEHICLE lost lateral control and stability, rolled over, and its roof failed without necessary protections systems, causing injuries and damages to Ms. Castleman, who was properly restrained.

23. The SUBJECT DEFECTS made an occupant of the SUBJECT VEHICLE susceptible and vulnerable to serious injury and/or death anytime that vehicle had to be turned suddenly.

24. The SUBJECT VEHICLE was unsafe for its intended use and reasonably foreseeable misuses because of the SUBJECT DEFECTS, in that when the SUBJECT VEHICLE

was used by the driver as intended and in a reasonably foreseeable manner, the SUBJECT

DEFECTS made the SUBJECT VEHICLE dangerous, defective, and caused Ms. Castleman

serious and permanent injuries and damages.

25. Ms. Castleman's injuries and damages would not have occurred had the

SUBJECT DEFECTS not existed in the SUBJECT VEHICLE. The SUBJECT DEFECTS were a

substantial factor in producing and causing Ms. Castleman's injuries and other damages. As a

direct, proximate, and legal result of the defects inherent in the SUBJECT VEHICLE, including

but not limited to the SUBJECT DEFECTS:

a. Ms. Castleman suffered severe and permanent bodily injuries, legally resulting in

damages for past and future medical care and expenses, loss of past and future income, and other

economic damages; and

b. Serious, severe, and permanent injuries legally resulting in non-economic

damages for pain, suffering, disfigurement, emotional pain and suffering, and other losses all in a

sum in excess of the minimum subject matter jurisdiction.

## SECOND CAUSE OF ACTION
### (Negligent Product Liability)

26. Plaintiff realleges and incorporates the above allegations as though fully set forth

herein.

27. At all times mentioned, Defendant had a duty to safely and properly manufacture,

design, assemble, import, package, test, fabricate, analyze, inspect, merchandise, test, market,

distribute, label, advertise, promote, sell, and provide adequate warnings about the SUBJECT

VEHICLE and its component parts and systems without defect.

28. At all times mentioned, Defendant knew, or in exercising reasonable care should

have known, that the SUBJECT VEHICLE and each of its component parts were unsafely,

10

improperly, and defectively manufactured, designed, assembled, imported, installed, packaged, tested, fabricated, analyzed, inspected, merchandised, marketed, distributed, labeled, advertised, promoted, or sold; that inadequate warnings and/or no warnings were provided for the use and purpose for which the SUBJECT VEHICLE was intended; and that the SUBJECT VEHICLE was likely to injure or kill its users associated with foreseeable driver conduct and roadway conditions.

29. Defendant so negligently and carelessly, manufactured, designed, assembled, imported, packaged, tested, fabricated, analyzed, inspected, merchandised, marketed, modified, distributed, labeled, advertised, promoted, sold, supplied, leased, rented, repaired, serviced, maintained, selected, and provided inadequate warnings regarding the SUBJECT VEHICLE and its component parts and systems, that it was a defective and dangerous product, unsafe for the use and purpose for which it was intended when used or misused in a reasonably foreseeable manner. In particular, the SUBJECT VEHICLE was dangerous and defective because rollover of the SUBJECT VEHICLE, during a reasonably foreseeable incident sequence, was likely to cause increased, substantial, and potentially permanent injuries or death to the driver of the vehicle, including but not limited to roof crush.

30. Defendant was negligent in designing, manufacturing, and/or selling the SUBJECT VEHICLE and its components. Defendant failed to use the amount of care in designing, manufacturing, and/or installing the SUBECT VEHICLE and its components that a reasonably careful designer, manufacturer, and/or installer would and is required to use in similar circumstances to avoid exposing others to a foreseeable risk of harm. Defendant's negligence was a substantial factor in causing Ms. Castleman's injuries and her damages.

11

31. At the time of the design, manufacture, assembly, distribution, and sale of the SUBJECT VEHICLE, with its component parts and systems, Defendant knew or should have known about the likelihood and severity of potential harm posed by the SUBJECT VEHICLE and the comparatively small burden and expense of taking safety measures to reduce or avoid this harm.

32. The SUBJECT DEFECTS in the SUBJECT VEHICLE were compounded by Defendant's failure to provide adequate instruction or warning of potential safety hazards created by these defects, increasing risk of injury to occupants during a rollover accident.

33. The SUBJECT VEHICLE was also defective because it did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way, including but not limited to when it rolled over.

34. Alternative safer designs were available to and feasible for Defendant when it manufactured the SUBJECT VEHICLE and component parts and systems, including but not limited to side-impact and rollover-protection safety systems including airbags, directional and lateral stability and handling designs, ESC systems, roof-crush protection, and occupant protection systems. The cost of any such alternative design and manufacture was insignificant compared to the seriousness and severity of the harm that could be caused, and that did result in severe injuries to Ms. Castleman.

35. The SUBJECT VEHICLE, because of the SUBJECT DEFECTS, had potential risks known to or knowable by Defendant in light of the knowledge generally accepted in the automotive industry at the time of the manufacture, distribution, and sale of the SUBJECT VEHICLE.

36. The potential risks created by the SUBJECT DEFECTS presented a substantial danger when the SUBJECT VEHICLE was used or misused in an intended or reasonably foreseeable way, including but not limited to when a driver turned the vehicle suddenly. Ordinary consumers would not have recognized the SUBJECT DEFECTS or the potential risks created by the SUBJECT DEFECTS. Defendant failed to adequately warn or instruct of the SUBJECT DEFECTS or the potential risks created by the SUBJECT DEFECTS. The lack of sufficient instructions or warnings was a substantial factor in causing Ms. Castleman's serious injuries and damages.

37. Defendant was negligent because it failed to recall the SUBJECT VEHICLE. Defendant knew or reasonably should have known that the SUBJECT VEHICLE was defective and dangerous or was likely to be dangerous when used in a reasonably foreseeable manner. Defendant learned of these defects before or after the SUBJECT VEHICLE was sold, but long before the SUBJECT INCIDENT. Yet, Defendant failed to recall or warn of the defects and danger of the SUBJECT VEHICLE. A reasonable manufacturer, distributor, and seller under the same or similar circumstances would have recalled this vehicle. Defendant's failure to recall the SUBJECT VEHICLE was a substantial factor in causing Ms. Castleman's serious and permanent injuries and damages.

38. As a direct, legal, and proximate result of the negligence, carelessness, and unlawful conduct of Defendant and the defects inherent in the vehicle, including but not limited to the SUBJECT DEFECTS and Defendant's refusal to recall the SUBJECT VEHICLE and remedy the SUBJECT DEFECTS, Ms. Castleman was injured, and has suffered serious and permanent injuries, including special and general damages in a sum over the minimum subject matter jurisdiction of this Court.

39.  Ms. Castleman's injuries and damages would not have occurred had the SUBJECT DEFECTS not existed in the SUBJECT VEHICLE. As a direct and proximate result of the negligence, carelessness, and unlawful conduct of Defendant, the SUBJECT VEHICLE was defective and Ms. Castleman suffered serious and permanent injuries and damages:

a.   Ms. Castleman suffered severe and permanent bodily injuries, legally resulting in damages for past and future medical care and expenses, loss of past and future income, and other economic damages; and

b.   Serious, severe, and permanent injuries legally resulting in non-economic damages for pain, suffering, disfigurement, emotional pain and suffering, and other losses all in a sum in excess of the minimum subject matter jurisdiction.

### THIRD CLAIM FOR RELIEF
#### (Breach of Warranties)

40. Plaintiff realleges and incorporates all above allegations as if fully set forth herein.

41. An implied warranty of merchantability and/or an implied warranty of fitness existed with respect to the SUBJECT VEHICLE.

42. Defendant knew or had reason to know the particular purposes or uses for which the SUBJECT VEHICLE and its components were intended, required and were to be used, and that purchasers and users, such as Ms. Castleman, would reasonably rely on Defendant's skill or judgment in designing, testing, manufacturing, and furnishing goods suitable for such purposes and uses and to disclose the risks and dangers of the PRODUCT.

43. Ms. Castleman had no knowledge at all times referred to herein of the falsity or incompleteness of Defendant's statements and representations concerning the PRODUCT. Defendant had sole access to the material facts concerning defects to the SUBJECT VEHICLE and knew users such as Ms. Castleman could not have reasonably discovered such defects.

14

44. The SUBJECT VEHICLE and its components were not fit for the particular purposes for which they were intended, and for which they were used.

45. At the time the SUBJECT VEHICLE was designed, manufactured and sold, Defendant knew or reasonably should have known that it was not reasonably safe for its intended uses.

46. At the time the SUBJECT VEHICLE was designed, manufactured and sold, Defendant knew or reasonably should have known that it posed unreasonable risks of injury to its users. Defendant expressly and impliedly represented and/or warranted the SUBJECT VEHICLE was of merchantable quality and safe and fit for its intended uses.

47. At the time of the SUBJECT INCIDENT, the SUBJECT VEHICLE did not conform to the warranties, affirmations, and representations made by Defendant.  Defendant's breach of its warranties was a direct and proximate cause of the injuries and damages to Ms. Castleman.

48. Defendant had a duty to exercise reasonably care in the research, development, design, testing, manufacture, inspection, labeling, distribution, marketing, promoting, selling, and releasing the PRODUCT into the stream of commerce.

49. As a direct and proximate result of Defendant's breach of warranties, Ms. Castleman suffered serious and permanent injuries and damages:

a.   Ms. Castleman suffered severe and permanent bodily injuries, legally resulting in damages for past and future medical care and expenses, loss of past and future income, and other economic damages; and

b.   Serious, severe, and permanent injuries legally resulting in non-economic damages for pain, suffering, disfigurement, emotional pain and suffering, and other losses all in a sum in excess of the minimum subject matter jurisdiction.

## FOURTH CAUSE OF ACTION
### (Knowing, Reckless and/or Intentional Misconduct)

50. Plaintiff realleges and incorporates all allegations above as though fully set forth herein.

51. Plaintiff Ms. Castleman believes and alleges that Defendant recklessly and/or intentionally engaged in conduct regarding the SUBJECT DEFECTS that exposed her to serious potential danger of death and/or catastrophic injury from such past evidence and information. To advance Defendant's pecuniary interests, Defendant knowingly and intentionally acted with conscious disregard for the safety of Ms. Castleman and other users of the SUBJECT VEHICLE, which warrants an award of exemplary damages against Defendant under the doctrine enunciated in *Ferule v. Illinois Mut. Life & Caves. Co.* (1987) 152 Ariz. 600, and *Grimshaw v. Ford Motor Company* (1981) 119 Cal.App.3d 757. The facts showing Defendant's conduct that exposed Ms. Castleman and other users of the SUBJECT VEHICLE to serious potential danger known to Defendant to advance their pecuniary interests are, on information and belief as follows.

52. Before and during the design, manufacture, assembly, distribution, and sale of the SUBJECT VEHICLE and its component parts and systems, and thereafter, Defendant knew that the SUBJECT VEHICLE had one or more defects, and that proceeding with the manufacture of the SUBJECT VEHICLE including those defects made the risk of injury and damage to occupants of the SUBJECT VEHICLE more than a possible risk of harm and that injury and damage to occupants was reasonably certain to occur during intended use and/or foreseeable misuse. Defendant knew the following and designed, manufactured, built and sold the SUBECT

16

VEHICLE and its component part with known defects despite injury and damages being probable:

a. THE SUBJECT VEHICLE HAD INADEQUATE ROOF-CRUSH PROTECTION. Despite the longstanding recommendations of knowledgeable and caring automotive engineers, and in spite of the known rollover propensity of Defendant's light trucks, vans, SUVs, and the SUBJECT VEHICLE, Defendant chose to ignore the inherent safety problem of rollover occupant injuries caused by inadequate roof pillar strength during rollovers, and took no action to prevent or minimize such debilitating injuries and deaths because of concern about cost penalties and other self-serving interests. Defendant's decision to save money at the expense of human life and pain and suffering constitutes callous disregard for the safety of the motoring public, including Ms. Castleman. Defendant's failure to act is enhanced by the similar acts of its competitors, and is shameful and shocking that such a large, powerful and influential industry has for years conspired to resist obvious major opportunities to improve motor-vehicle safety by improving the design of the roof systems in automobiles, trucks, vans and SUVs, and the SUBJECT VEHICLE, all to advance its own pecuniary interest. Safer alternative designs not only existed but were known to FCA before, at the time, and after it designed, manufactured, and placed the SUBJECT vehicle into the stream of commerce, including but not limited to stronger roof designs and structures, stronger roof materials, roof-crush resistant roof designs, and roof-crush resistant roof materials that could withstand the known forces involved in real-world rollover accidents. Despite knowing safer alternative designs existed and that the SUBJECT VEHICLE's design was unsafe and could not withstand the forces involved in a real-world rollover accident, Defendants chose to of manufacture, fabricate, design, assemble, package, import, distribute, sell, service, market, label, warrant,

17

retail, wholesale, and advertise the SUBJECT VEHICLE with reckless disregard for human safety and life.

b.      Since 1968, Defendant has known and been placed upon notice contemporaneously as a result of crash data, in-house testing, field-service reports, and published studies that actual users of and passengers carried within pick-up trucks, vans and SUVs, including but not limited to the SUBJECT VEHICLE, could and would sustain serious and substantial head and neck injuries during rollover crashes when such vehicles, and the SUBJECT VEHICLE, were and are actually used by members of the public as intended or misused in a reasonable foreseeable manner.

c.      Since 1968, Defendant has known and has been placed upon notice contemporaneously as a result of the information described herein, that the A-Pillars/Windshield headers and roof rails of trucks, vans, and SUVs, and the SUBJECT VEHICLE, must be manufactured and fabricated to withstand real-world rollover crushing forces in order to adequately protect users of such vehicles and members of the public from serious injuries and/or death from roof crush and lack of survival space and occupant protection during the rollover accident.

d.      In approximately 1983 and 1984, Chrysler and Anthony Sances of the Medical College of Wisconsin published industry studies which further established that the A-Pillars/Windshield headers and roof rails of trucks, vans, and SUVs, and the SUBJECT VEHICLE, must be manufactured and fabricated to prevent roof crush in order adequately to protect users of such vehicles and members of the public from serious injuries and/or death during rollovers.

e.      In 1984, Hybrid III crash dummy specifications were published for a catastrophic compressive neck injury of 4,000 Newtons at the load cell (i.e., the base of the human head), despite the fact that such forces were approximately one-half of the crushing forces, which Defendant knew from cadaver and other studies in its possession or of which it was aware, were minimally necessary to effect head and neck injuries.  These actions were taken to establish a false set of rollover crush force minima that were known to Defendant not to be representative of actual rollover accident conditions, and which were intended by Defendant to, and in fact did, falsely lead the public and regulatory bodies of the U.S. Government to believe that Defendant's trucks, vans and SUVs had sufficiently fortified A-Pillars/Windshield headers and roof rails.

f.      Defendant knowingly conducted inadequate roof testing that did not represent real world rollovers, and improperly relied on the windshield and/or glass for roof strength. Instead of utilizing roof crush tests known as "inverted drop tests,"—a standard used by other automobile companies before and at the time the SUBJECT VEHICLE was designed and manufactured and a test that was used by Defendant momentarily around thirty years prior— Defendant used a quasi-static test that applied pressure very slowly to the vehicles' roofs while the windshields and/or windows were in place and up which simulated unrealistic circumstances and forces.  Defendant knew that real-world rollover forces were approximately two times the forces it used in the quasi-static tests.  Defendant knew that its roofs would not withstand real-world rollover forces.  Defendant knowingly utilized the unsafe and inadequate roof tests in order to mislead the public into believing its vehicles were safe and to save money by not having to use or incorporate safer materials, equipment, component parts, and design into its vehicles, including the SUBJECT VEHICLE. Defendant knew and intended that members of the public

and users of such vehicles were being exposed and would continue to be exposed to death and serious injuries from roof crush during rollovers when its trucks, vans, SUVs, and the SUBJECT VEHICLE were and are actually being used as intended or in a reasonably foreseeable manner.

g.       At all times relevant herein, Defendant was aware that use of complete sections, thicker steel, reinforcements, and stronger materials in its roof structures, including but not limited to A-Pillars/Windshield headers and roof rails, was at all times mechanically feasible, posed no adverse consequences to consumers or to Defendant's trucks, vans and SUVs, were only marginally more expensive to implement, and that the use of complete sections, thicker steel, and stronger materials in A-Pillars/Windshield headers and roof rails, among other roof structures would withstand rollover impact forces and prevent death and serious injuries in most actual rollover accidents, including the SUBJECT INCIDENT.

h.       At all times herein mentioned, on information and belief, Defendant knew and was aware that members of the public were suffering death and serious injuries in rollover accidents at alarming and unproportionate rates that involved roof crushing forces and the failure of roofs and roof structures in Defendant's trucks, vans and SUVs including the SUBJECT VEHICLE, as a result of Defendant's failure to use complete sections and to use thicker steel and stronger materials in its roof structures, including but not limited to A-Pillars/Windshield headers and roof rails in its vehicles.

i.       At all times relevant herein, despite the fact that Defendant was aware that use of complete sections, thicker steel, and stronger materials in A-Pillars/Windshield headers and roof rails was at all times mechanically feasible, posed no adverse consequences to consumers or to Defendant's trucks, vans and SUVs, were only marginally more expensive to implement, and would have prevented deaths and serious injuries in most actual rollover accident

20

cases, including the SUBJECT INCIDENT, Defendant intentionally refused to use complete sections, thicker steel, and/or stronger materials in A-Pillars/Windshield headers and roof rails of its trucks, vans and SUVs: (1) to avoid increased expense (including costs of redesign, more extensive material, retooling, re-certification expenditures, and other costs of implementation), so as to preserve and widen Defendant's profit margin on the sales of such vehicles; (2) to avoid disclosure during re-certification and retooling processes of the fact that Defendant knew its previously manufactured trucks, vans and SUVs' A-Pillars/Windshield headers and roof rails were of insufficient strength to withstand even modest actual rollover accidents without the risks of serious injuries and death, which would greatly increase Defendant's legal exposure in cases arising from rollovers of production vehicles already in use by the public; and (3) to avoid taking action that would result in disclosures leading to an expensive recall campaign by the National Highway Transportation Safety Administration.

j. THE SUBJECT VEHICLE HAD NO ESC.  Defendant intentionally failed to install Electronic Stability Control (ESC) in the SUBJECT VEHICLE, even though it was not only technologically feasible, but also readily available to this Defendant as early as 1997. General Motors introduced its version of ESC trademarked as "StabiliTrak" in 1997 for select Cadillac models, including the Eldorado Touring Coupe, DeVille, and Seville. StabiliTrak then quickly became available on many other General Motors vehicles. In 1999, nearly every auto manufacturer had at least one model with ESC, including General Motors in its mid-sized Oldsmobile Intrigue.  Also in 1997, Cadillac introduced an integrated vehicle handling and software control system, called Integrated Chassis Control System (ICCS), on the Cadillac Eldorado. It involved an omnibus computer integration of engine, traction control, Stabilitrak electronic stability control, steering, and adaptive Continuously Variable Road Sensing

Suspension (CVRSS), with the intent of improving responsiveness to driver input, performance, and overall safety. In 2000, Ford launched its version of ESC, called "AdvanceTrac." In 2003, Ford added Roll Stability Control to AdvanceTrac in the Volvo XC90. In 2003, General Motors included StabiliTrak on its 2500 series Suburbans. A primary purpose of ESC, a computerized technology, improves a vehicle's stability by detecting and reducing loss of traction or skidding. When ESC detects loss of steering control, it automatically applies the brakes to help "steer" the vehicle where the driver intends to go. Braking is automatically applied to wheels individually, such as the outer front wheel to counter oversteer or the inner rear wheel to counter understeer. According to Insurance Institute for Highway Safety and the U.S. National Highway Traffic Safety Administration, one-third of fatal accidents could be prevented by the use of ESC. For these reasons, ESC was readily available to Defendant when designing, manufacturing, and, marketing the SUBJECT VEHICLE, and it should have and could have installed this technology in the SUBJECT VEHICLE, at relatively little additional cost. Had ESC been installed in the SUBJECT VEHICLE, it would likely have sensed oversteer or understeer, and automatically adjusted braking and throttle to match the vehicle's direction to the driver's intention to assist the driver in maintaining directional control. Such ESC system, had it been installed in the SUBJECT VEHICLE, would have likely dampened and mitigated the dynamic oscillations and oversteer in the laterally unstable SUBJECT VEHICLE sufficiently to have prevented the ultimate loss of control and rollover that caused Ms. Castleman's resulting injuries. Such ESC should have been standard equipment on the SUBJECT VEHICLE given (1) the enhanced aforementioned lateral instability and rollover propensities of the SUBJECT VEHICLE known to Defendant, (2) the likelihood that a rollover threatened severe injuries or fatalities to vehicle occupants, and (3) the purpose of the SUBJECT VEHICLE, i.e., for use by members of the

public inexperienced with the aforementioned lateral instability and rollover propensities of the SUBJECT VEHICLE and/or of unknown and/or undisclosed driving experience.

      k.    THE SUBJECT VEHICLE HAD NO SIDE-CURTAIN ROLLOVER AIRBAG SYSTEM.  Defendant intentionally failed to install any side-curtain rollover airbag system in the SUBJECT VEHICLE, even though it was not only technologically feasible, but also readily available as early as 2002 and so could have been installed in the SUBJECT VEHICLE at relatively little additional cost. After all, side-curtain rollover airbag systems were being installed in 2002 in the Toyota Land Cruiser, Lexus LX470, Ford Explorer, and Mercury Mountaineer. In 2003, many vehicles offered side-curtain rollover airbag systems as *standard equipment*. Had the SUBJECT VEHICLE had a side-curtain rollover airbag system, Ms. Castleman's injuries, harms and damages would likely have been prevented or significantly reduced.

      l.    A side-curtain rollover airbag system should have been standard equipment on the SUBJECT VEHICLE given (1) the enhanced aforementioned lateral instability and rollover propensities of the SUBJECT VEHICLE known to Defendant, (2) the likelihood that a rollover threatened severe injuries or fatalities to vehicle occupants, and  (3) the purpose of the SUBJECT VEHICLE, i.e., for use by members of the public inexperienced with the aforementioned lateral instability and rollover propensities of the SUBJECT VEHICLE and/or of unknown and/or undisclosed driving experience. Moreover, a rollover sensor could also have been used to activate a pretensioner.  Side-curtain rollover airbag systems were developed for the specific purpose of protecting occupants wearing seatbelts within a vehicle, especially an SUV such as the SUBJECT VEHICLE. Had a side-curtain rollover airbag system been installed in the

SUBJECT VEHICLE, it would have deployed upon the vehicle rollover in the SUBJECT INCIDENT and likely prevented Ms. Castleman's injuries and damages.

      m.    THE SUBJECT VEHICLE HAD INADEQUATE SAFETY RESTRAINT PROTECTION DURING ROLLOVERS.  Defendant acted with a callous disregard for the safety of Ms. Castleman and the motoring public with respect to eliminating or reducing injuries and deaths due to the defective safety restraint systems in vehicles that have a greater propensity to roll, namely, Defendant's trucks, vans and SUVs.  Feasible, reasonable alternative designs were available to Defendant, including but not limited, to rollover activated pretensioners, cinching latch plates, and seat integrated restraints. Moreover, at all times herein relevant, Defendant knew the seatbelt is mounted to the roof, introducing slack into the safety restraint system when the roof deforms during rollover events, rendering the restraint system completely ineffective and otherwise useless to protect occupants.

      n.    Defendant's chosen design for the SUBJECT VEHICLE and its components exposed occupants to an unnecessarily increased risk of the SUBJECT DEFECTS during normal and foreseeable vehicle-operation circumstances such as those that were involved in the SUBJECT INCIDENT.

      o.    The SUBJECT DEFECTS subjected Ms. Castleman to increased and potentially fatal injuries during reasonably foreseeable vehicle-operation circumstances, including but not limited to a rollover accident and the SUBJECT INCIDENT.

      p.    At all relevant times, Defendant knew the SUBJECT VEHICLE's design was defective and unreasonably dangerous to users under normal and foreseeable circumstances, such as those in the SUBJECT INCIDENT.

q.    At all relevant times, the Defendant knew other feasible and safer design alternatives were available that would have significantly reduced the risks of the SUBJECT DEFECTS causing the SUBJECT INCIDENT and injuries.

r.    At all relevant times, Defendant knew the devastating consequences of accidents in which vehicles roll over, roofs fail, and safety restraint systems fail, including but not limited to that such accident cause injuries like Ms. Castleman's—tremendous and conscious pain, suffering, and debilitation.

s.    At all relevant times, Defendant was purposely and intentionally misrepresenting, advertising and marketing the SUBJECT VEHICLE and others like it as suitable for use as a passenger vehicle on public highways without disclosure of the heightened risks and high likelihood of the SUBJECT DEFECTS to manifest during a reasonably foreseeable driving maneuver and resulting accident and cause serious injury/death.

53.   Despite the above-referenced knowledge and notice, to advance its pecuniary interests, Defendant knowingly, recklessly, willfully and with conscious disregard for the safety of users of the SUBJECT VEHICLE and other users of similar vehicles, designed, marketed, and sold such vehicles to the consuming public with no warning of the SUBJECT DEFECTS and with the conscious decision not to utilize safer and available design alternatives or to recall such defective vehicles.  Such actions were despicable because such conduct would and does seriously injure and kill people.

54. Defendant's actions, as herein described, were undertaken with a willful and conscious disregard for the rights and safety of consumers and users of Defendant's vehicles, including the SUBJECT VEHICLE, in order to advance the pecuniary gains of Defendant, and

were despicable because such conduct would and does cause serious and life changing injuries, including but not limited to Ms. Castleman's injuries suffered in the SUBJECT INCIDENT.

55. Plaintiff Ms. Castleman is informed and believes that the decisions made by Defendant in the design and manufacture of the SUBJECT VEHICLE with its SUBJECT DEFECTS, all in the defective and dangerous manner as alleged herein, were made by company management of Defendant, by the product of company policy. Such major and strategic design and manufacturing decisions, by virtue of the company structure of Defendant, could be made only at the level of company management, as the product of company policy, given the substantial capitalization requirements and risks associated with such high-level design, manufacturing, production, and marketing decisions across an entire vehicle platform line for the SUBJECT VEHICLE. As such, these decisions were and are the product of the entire company management and company policy of Defendant in conscious and willful disregard of public safety, and instead for Defendant's pecuniary gain.

56. As a direct and legal result of Defendants willful and wanton conduct in reckless disregard for human safety and life alleged in the above paragraphs, an award of exemplary and punitive damages against Defendant is warranted as proper and appropriate punishment and deterrence.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as to each and every cause of action as follows:

1. For special and economic damages, including past and future medical expenses, loss of past and future income, and earning capacity in an amount to be proven at trial

26

2.      For non-economic damages for injuries and impairments such as paralysis, disfigurement, and additional bodily and emotional injuries and damages in an amount to be proven at trial;

3.      For non-economic damages such as pain, suffering, physical and emotional distress, and other injuries and damages in an amount to be proven at trial;

4.      For costs incurred herein;

5.      For punitive damages; and

6.      For any other and further relief the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED this 25th of April, 2018.

DEWSNUP KING OLSEN WOREL
HAVAS MORTENSEN


*/s/ Colin P. King*
Colin P. King
Peter W. Summerill
*Attorneys for Plaintiff*